**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**MARCELLINA NWOSU, M.D.,**

   **Plaintiff,**

  **vs.**              **Civ. No. 23-119  JFR/KRS**

**OTERO COUNTY HOSPITAL
ASSOCIATION, INC., d/b/a GERALD
CHAMPION REGIONAL MEDICAL
CENTER,**

   **Defendant.**

### MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on Defendant's Renewed Motion to Dismiss

("Motion"), filed April 23, 2026.  Doc. 49.  On May 17, 2026, Plaintiff filed a Response.

Doc. 53.  On June 1, 2026, Defendant filed a Reply.  Doc. 54.  Having reviewed the parties'

submissions and the relevant law, and being otherwise fully advised, the Court finds the *Motion*

is well-taken in part and **GRANTED IN PART.**

### I.  PROCEDURAL BACKGROUND

On February 9, 2023, Plaintiff initially filed this matter as a *qui tam* action on behalf of

the United States against Gerald Champion Regional Medical Center Foundation ("Foundation")

alleging the Foundation submitted false claims for reimbursement to the United States in

violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729*, et seq*.  Doc. 1.  On October 23,

2025, the United States filed a Notice of Election to Decline Intervention.  Doc. 17.  On

October 28, 2025, the Court entered a Declination Order ordering, *inter alia*, that the Complaint

---

[1] Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b), the parties have consented to the undersigned to serve as the presiding judge and enter final judgment.  Docs. 23-26.

be unsealed and served upon the Defendant.  Doc. 18.  On January 8, 2026, Plaintiff Nwosu filed a Joint Stipulation of Dismissal of *Qui Tam* Claims Under 31 U.S.C. § 3729 of the FCA on behalf of all parties who appeared pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii).  Doc. 28.  The dismissal was with prejudice as to Count I of the Complaint and all *qui tam* claims under 31 U.S.C. § 3729 of Relator and without prejudice as to all claims of the United States.  *Id.*  The dismissal did not apply to Counts II and III of the Complaint in which Plaintiff asserted claims in her individual capacity and not on behalf of the United States, *i.e.,* employment-related claims under 31 U.S.C. § 3730(h) of the FCA Act and New Mexico common law.  *Id.*

On January 16, 2026, Defendant, in lieu of an Answer, filed a Motion to Dismiss seeking dismissal of Plaintiff's remaining claims.  Doc. 29.  Defendant made four arguments as grounds for dismissal.  Defendant first argued that Plaintiff named the wrong entity as Defendant.  Doc. 29 at 1-2, 8-10.  Plaintiff conceded that her employer was Otero County Hospital Association, Inc. d/b/a Gerald Champion Regional Medical Center and that Plaintiff's counsel, not Plaintiff, made a good-faith error naming the Foundation to Plaintiff's retaliation and wrongful termination claims.  Doc. 40 at 1.  Plaintiff asked that the Court exercise its "broad discretion" to allow Plaintiff to amend the Complaint and substitute Otero County Hospital Association, Inc., as the proper Defendant.  *Id.* at 2-3.  The Court agreed to do so and on March 27, 2026, entered a Memorandum Opinion and Order denying without prejudice Defendant's January 16, 2026, Motion to Dismiss and granting leave to refile when the properly named Defendant was substituted.  On April 9, 2026, the Court entered an Order granting Defendant's Unopposed Motion to Substitute Party and substituting Otero County Hospital Association, Inc. d/b/a Gerald Champion Regional Medical Center ("GCRMC") as Defendant.  Doc. 48.

Defendant's renewed Motion is now before the Court.

2

## II.  **FACTUAL ALLEGATIONS**

Plaintiff's Complaint contains the following factual allegations.

Plaintiff is a Board-Certified Nurse Practitioner with a Bachelor of Science Degree in Nursing, a Master of Science Degree in Nursing – Adult Nurse Practitioner, a Master's in Business Administration, and a Doctor of Medicine Degree.  Doc. 1 at 2, ¶ 1.  On or about March 15, 2019, Plaintiff entered into a Certified Nurse Practitioner Employment Agreement with Defendant.  *Id.* at ¶ 2.  Plaintiff was employed by Defendant from approximately March 15, 2019, through August 21, 2020.  *Id.* at ¶ 3.  Plaintiff's job duties included managing patient care; prescribing medications, including controlled substances, and other treatments; ordering, performing and interpreting diagnostic tests; and diagnosing and treating acute and chronic conditions.  *Id.* at ¶ 4.

On September 13, 2019, Plaintiff discovered that other unnamed GMRMC employees in the pain management clinic, none of whom were licensed healthcare providers, were performing History & Physicals ("H&Ps") for patients and using Plaintiff's electronic signature and National Provider Identifier ("NPI") number without her knowledge or authorization.  *Id.* at 2-3, ¶ 5.  Plaintiff alerted Defendant's Compliance Officer about the unauthorized use of her signature on H&Ps and stated that it constituted "Medicare/Medicaid fraud."  *Id.* at 3, ¶ 8.  Plaintiff also notified Dr. Brett Butz, Medical Director of the Chronic Pain Clinic about the H&Ps.  *Id.* at ¶ 9.  Dr. Butz met with Defendant's CEO Jim Heckert, the Chief Compliance Officer, Danielle Bynum,[2] and Dr. Albert Esparsen.[3]  *Id.*  On September 16, 2019, CEO Heckert met with Plaintiff about the H&Ps and assured Plaintiff that Defendant would investigate and remedy the matter.

---

[2] Plaintiff identifies Danielle Bynum as Defendant's Director of Operations – Physician Practice Management.  Doc. 1 at 3, ¶ 6.

[3] Plaintiff identifies Dr. Albert Esparsen II as Defendant's Vice President of Physician Practices.  Doc. 1 at 3, ¶ 7.

*Id.* at ¶ 10.  Plaintiff did not receive any follow-up information.  *Id.*  On October 10, 2019,

Dr. Butz wrote a letter to CEO Heckert summarizing the Chief Compliance Officer's findings

and asked to be informed of Defendant's plan to ensure that the allegedly fraudulent H&Ps

would not continue.[4]  *Id.*  at 4, ¶12.

On March 16, 2020, Plaintiff emailed Ms. Bynum about four cases in which Plaintiff had

ordered surgical procedures for her patients, such as radiofrequency ablation, and where the

performing physician unbundled the procedures by not operating on all areas of the patient as

ordered.  *Id.* at ¶ 13.  Plaintiff wrote to Ms. Bynum that the unbundling of procedures was

causing more operating room bills being submitted to payors, including upon information and

belief Medicare and Medicaid, and stated this was "obvious fraud and needs to be addressed."

*Id.*  On March 17, 2026, Ms. Bynum responded and told Plaintiff that the cases would be referred

to Quality for review.  *Id.* at ¶ 14.  Plaintiff did not receive any follow-up information.  *Id.*

On June 18, 2020, Dr. Esparsen emailed Plaintiff that she had to respond to GCMC Risk

Management concerning a report from CVS Pharmacy that Dr. Esparsen had received and

deemed problematic.  *Id.* at ¶ 15.  The CVS Pharmacy report was a standard notification about a

---

[4] Plaintiff alleges "upon information and belief" that Danielle Bynum instructed clinic employees to perform H&Ps and use Plaintiff's electronic signature and NPI number.  Doc. 1 at 3, ¶ 6.  Plaintiff alleges "upon information and belief" that Dr. Esparsen was aware of the situation and did nothing to correct it.  *Id.* at ¶ 7.  Plaintiff alleges "upon information and belief" that the Chief Compliance Officer determined that Plaintiff's signature, as well as Dr. Butz's signature, had been improperly used without their knowledge or authorization on H&Ps and that the Chief Compliance Officer reported this determination to CEO Heckert and Dr. Butz sometime in late September 2019 or early October 2019.  *Id.* at ¶ 11.

Allegations based "upon information and belief" have been deemed plausible "where the facts are peculiarly within the possession and control of the defendant ... or where the belief is based on factual information that makes the inference of culpability possible. *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citations omitted); *see also, e.g., New Mexico v. Cap. One Bank (USA) N.A.*, 980 F. Supp. 2d. 1314, 1321 (D.N.M. 2013). However, allegations based upon information and belief are only accepted as true where the complaint also brings forth a specific factual basis that demonstrates such belief.  *See Moore v. Kobach*, 359 F. Supp. 3d 1029, 1030 (D. Kan. 2019) ("[T]he question is whether such allegations are supported by specific facts asserted by the Complaint."); see also *Jackson-Cobb v. Sprint United Mgmt.*, 173 F. Supp. 3d. 1139, 1145-46 (D. Colo. 2016). Even when the facts are "peculiarly within the possession and control of the defendant," the complaint must still "set[ ] forth the factual basis for the plaintiff's belief" supporting the allegation. *See Scheidt v. Klein*, 956 F.2d 963, 967 (10th Cir. 1992); see also *Ray v. Ray*, 799 F. App'x 29, 31 n. 2 (2d Cir. 2020) (unpublished).

prescription Plaintiff wrote for a patient for an opioid and benzodiazepine. *Id.* at ¶ 16. On June 19, 2020, Dr. Butz responded to Dr. Esparsen by email on Plaintiff's behalf and explained that the pharmacy notification was a "common form" and did not require review by GCMC Risk Management. *Id.* at 5, ¶ 17. Dr. Esparsen responded to Plaintiff and Dr. Butz that the "Board of Pharmacy" thought the prescription was problematic. *Id.* at ¶ 18. Plaintiff followed up with Dr. Esparsen three separate times asking for more information and did not receive a response. *Id.* at ¶ 19. The New Mexico Board of Pharmacy never contacted Plaintiff. *Id.* at ¶ 20. On June 29, 2020, Dr. Butz informed Plaintiff that Dr. Esparsen had misspoke about the prescription being problematic. *Id.* at ¶ 21. On August 20, 2020, two weeks after Plaintiff's last email to Dr. Esparsen regarding the CVA Pharmacy report, CEO Heckert wrote to Plaintiff that Defendant was terminating Plaintiff's employment effective August 21, 2020. *Id.* at ¶ 22.

After terminating Plaintiff's employment, Defendant withheld Plaintiff's prescription pads and did not respond to her requests to return them. *Id.* at ¶ 23. Plaintiff contacted the New Mexico Board of Pharmacy regarding her withheld prescription pad and learned she could request her prescribing history through the New Mexico Prescription Monitoring Program. *Id.* at 6, ¶ 24. Plaintiff did so and discovered that Defendant continued to use her prescriptive authority and that 269 prescriptions for controlled substances were written after terminating her employment. *Id.* at ¶¶ 25-26.

### III. ARGUMENTS AND ANALYSIS

Defendant makes three arguments for dismissal pursuant to Fed. R. Civ. P. 12(b)(6). Defendant first argues that Plaintiff's employment agreement imposes a mandatory pre-suit mediation requirement "prior to making any claim," which Plaintiff failed to satisfy before filing this action. Doc. 49 at 2, 7-8. Next, Defendant argues that Plaintiff's FCA retaliation claim fails

on the merits because Plaintiff's Complaint does not plausibly allege protected activity tied to the federal FCA, employer notice of such activity, or causation. *Id.* at 2, 8-13. And third, Defendant argues that Plaintiff's state law wrongful discharge claim fails because Plaintiff has an adequate remedy available through the FCA's anti-retaliation provision therefore barring her state-law claim, and because a state law wrongful discharge claim is only available to "at-will" employees and Plaintiff was subject to an employment agreement. *Id.* at 2, 13-16.

Fed. R. Civ. P. 12(b)(6) provides that a party may assert by motion the defense of failure to state a claim upon which relief can be granted. In deciding a motion to dismiss premised on Rule 12(b)(6), the Court accepts the factual allegations in the complaint as true and views them in the light most favorable to the plaintiff. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). While the facts in the complaint need not be detailed, they must be sufficient to allow the Court to draw "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotation marks and citation omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration, internal quotation marks, and citation omitted). Indeed, "[c]onclusory allegations are not entitled to the assumption of truth." *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021) (internal quotation marks and citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. *Twombly,* 550 U.S. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S.

at 678. "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis omitted). A court will not construe a plaintiff's pleadings "so liberally that it becomes his advocate." *Bragg v. Chavez*, 2007 WL 5232464, at *25 (D.N.M. Aug, 2, 2007).

In deciding a motion to dismiss challenging the legal sufficiency of a complaint, the Court generally must exclude extraneous material or convert the motion to one for summary judgment. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017). "A district court may, however, consider documents attached to or referenced in the complaint if they are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Id.* (internal quotation marks and citation omitted). Moreover, the Court may take judicial notice of its own files and records in deciding this type of motion. *Tellalabs, Inc. v. Makor Issues & Rts.*, 551 U.S. 308, 322 (2007); *see Binford v. United States*, 436 F.3d 1252, 1256 n.7 (10th Cir. 2006). Judicial notice of court filings is particularly helpful in situations where a motion to dismiss invokes preclusion doctrines. *See, e.g.*, *Nichols v. Danley*, 266 F. Supp. 2d 1310, 1312 (D.N.M. 2003).

### A.    Certified Nurse Practitioner Employment Agreement

Defendant first argues that this action should be dismissed because Plaintiff failed to comply with the mandatory pre-suit mediation requirement found in the Certified Nurse Practitioner Employment Agreement ("Employment Agreement").[5] Defendant cites Section 9.10 of the Employment Agreement which provides:

---

[5] Defendant attached a copy of the Employment Agreement to its Renewed Motion to Dismiss. Doc. 49-1. Plaintiff does not dispute its authenticity.

> All PARTIES to this Agreement mutually agree that they shall submit to non-binding mediation in the event there shall be a claim, dispute or disagreement pertaining to provisions contained in this employment Agreement prior to making any claim against either PARTY.

Doc. 49 at 7. Defendant argues that courts within the Tenth Circuit have routinely dismissed claims where plaintiffs have failed to comply with mandatory mediation provisions.[6] *Id.* at 8. Defendant argues that permitting Plaintiff to bring her claims without first engaging in mediation would rewrite the terms of the agreement into which she entered for her employment. *Id.*

In her Response, Plaintiff contends that the contractual pre-suit mediation requirement in the Employment Agreement is limited to disputes pertaining to provisions of the Employment Agreement and not to Plaintiff's FCA retaliation claim. Doc. 53 at 2-4. Plaintiff contends that the cases Defendant cites are distinguishable and in response cites case law in which a district court denied a motion to dismiss on similar grounds and reasoned that an FCA retaliation claim did not arise from an employment agreement and that a pre-suit mediation/arbitration clause did not apply. *Id.* (citing *United States v. Miraca Life Sciences, Inc.,* 2021 WL 679275, *2-3 (M.D. Tenn. Feb. 22, 2021)).

---

[6] Defendant cites *Lewis v. Eassit, Inc.,* 2023 WL 2522812, at *1 (D. Utah. Mar. 15, 2023) (dismissing plaintiff's claims for failure to pay minimum wage and overtime in violation of the Fair Labor Standards Act because she failed to engage in mediation before filing the lawsuit as required by the contractor service agreement which provided that "[a]ny and all disputes arising from, or relating to, this Agreement shall *first* be attempted to be resolved through good faith, non-binding mediation."); *Jones v. W. Flyer Express LLC*, 2025 WL 2671561, at *3 (W. D. Okla. Sept. 17, 2025) (explaining that dismissal was warranted where plaintiff who asserted claims for violations of the federal Truth-in-Leasing requirements and the Oklahoma Protection of Labor Act failed to plead compliance with the mediation provision of the Contracted Operator Agreement which called for an independent mediator "[i]n the event of any disagreement or dispute between [the parties] regarding the subject matter of this COA or the relationship between the parties[.]"); *LifeVantage Corp. v. Hollenback*, 2021 WL 2779280, at *1-2 (D. Utah July 2, 2021) (granting motion to dismiss contractual claims on grounds that defendants' contracts with plaintiff imposed mandatory dispute resolution protocols for "disputes . . . that arise from or relate to the Agreement," including informal negotiation and non-binding mediation that plaintiff failed to comply with before bringing action); and *Diggs v. Curricula, LLC*, 2009 WL 467840, at *3 (W.D. Okla. Feb. 24, 2009) (dismissing cross-claimant's indemnification claim pending contractually mandatory mediation/arbitration as to any disputes arising between the parties).

In Reply, Defendant argues that Plaintiff's statutory claims for retaliation and wrongful discharge are fundamentally rooted in her employment relationship with Defendant which exists solely by virtue of and is governed by the Employment Agreement.  Doc. 54 at 2-3.  Defendant further argues that the Tenth Circuit has recognized that language such as "pertains to" or "related to" are broad terms and should be interpreted expansively to cover not only breach of contract claims, but also any dispute with a factual connection to the contract or arising from the employment relationship established by the Employment Agreement.[7]  *Id.*

To state a claim for breach of contract under New Mexico law, a plaintiff must show (1) the existence of a contract, (2) breach of the contract, (3) causation, and (4) damages.  *Am. Mech. Sols., L.L.C. v. Northland Process Piping, Inc.*, 184 F. Supp. 3d 1030, 1057 (D.N.M. 2016).  Accordingly, a complaint for a breach of contract must generally allege "(1) the existence of a valid and binding contract; (2) the plaintiff's compliance with the contract and h[er] performance of the obligations under it; (3) a general averment of the performance of any condition precedent; and (4) damages suffered as a result of the defendant's breach." *McCasland v. Prather*, 585 P.2d 336, 338 (N.M. Ct. App. 1978) (quoting Wright and Miller, Federal Practice and Procedure: Civil § 1235 (1969)).  "In contract interpretation, '[New Mexico courts] give force and effect to the intent of the parties.' " *W. Albuquerque Land Holdings, LLC v. Westland Partners, LLC*, 557 P.3d 1032, 1045 (N.M. Ct. App. 2024) (quoting *Bachmann v. Regents of Univ. of N.M.*, 496 P.3d 604, 609 (N.M. Ct. App. 2021)).  Courts "derive the parties' intent 'from

---

[7] Defendant cites *Atain Specialty Ins. Co. v. Eagle's Pointe LLC*, 2025 WL 275940, *3 (10th Cir. Sept. 29, 2025) (affirming the district court in this declaratory judgment action on the question of whether an insurer had no duty to defend a landlord in a wrongful death claim based on an alleged failure to maintain the furnace and heat where the insurance policy included a habitability exclusion which covered all claims that applied to "any" matter or claim that "pertains to" or "is related to" habitability and holding that "any," "pertains to," and "related to" are broad terms such that the exclusion covers all claims dealing with the subject matter of habitability) (citing *Kelvion, Inc. v. PetroChina Can. Ltd.*, 918 F.3d 1088, 1093 (10th Cir. 2019)).

the language employed by them; and where such language is not ambiguous, it is conclusive.' "

*Id.* (quoting *ConocoPhillips Co. v. Lyons*, 299 P.3d 844, 852 (N.M. 2013)).

The parties do not dispute the validity of the Employment Agreement.  Instead, the issue is whether Plaintiff has failed to comply with its terms by bringing the FCA retaliation claim before engaging in pre-suit mediation as a condition precedent to civil litigation.  As previously stated, the relevant contract provision states:

> All PARTIES to this Agreement mutually agree that they shall submit to non-binding mediation in the event there shall be a claim, dispute or disagreement pertaining to provisions contained in this employment Agreement prior to making any claim against either PARTY.

Doc. 49 at 7.  Defendant argues that this language should be interpreted expansively to cover not only breach of contract claims, but also any dispute with a factual connection to the contract or arising from the employment relationship, including statutory claims.  Doc. 54 at 2.

As an initial matter, the contract language here calls for pre-suit mediation and not arbitration.  Thus, the policy considerations and constraints of an arbitration clause are not before the Court.  *See generally, Laurich v. Red Lobster Restaurants, LLC,* 295 F.Supp.3d 1186, 1202-05 (D.N.M. Nov. 8, 2017) (discussing federal and New Mexico law policies and considerations with respect to arbitration agreements).  That said, given the dearth of case law addressing the enforceability of pre-suit mediation clauses generally or to pre-suit mediation clauses and FCA claims specifically, the Court reservedly looks to case law addressing arbitration clause disputes for guidance.

The Court is not persuaded that the plain language of the Employment Agreement supports Defendant's broad interpretation.  "To determine whether a particular dispute falls within the scope of an agreement's arbitration clause, a court should undertake a three-part inquiry."  *Cummings v. FedEx Ground Package Sys., Inc.*, 404 F.3d 1258, 1261 (10th Cir. 2005)

10

(quoting *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.,* 252 F.3d 218, 224 (2d Cir. 2001)).

> First, recognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow.  Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause. *Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview.*  Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it.

*Id.* (emphasis added; internal citations and quotations omitted).  Applying this inquiry here, the Court construes the pre-suit mediation clause as narrow.  For instance, the pre-suit mediation clause does not include language such as "any or all" or "in connection with," nor does it reference the "employment relationship" more broadly.  And it certainly does not contain the language Defendant seeks to implicitly insert, *i.e.,* "any dispute with a factual connection to the contract or arising from the employment relationship, including statutory claims."  *See, e.g., Brown v. Coleman Co.,* 220 F.3d 1180, 1184 (10th Cir. 2000) (noting the arbitration clause which covered "all disputes or controversies arising under or in connection with this Agreement" was broad because it covered not only those issues arising under the employment contract but also those issues with any connection the contract); *GATX Mgmt. Servs., LLC v. Weakland*, 171 F. Supp. 2d 1159, 1163 (D. Colo. 2001) (finding an arbitration clause that mandated arbitration for "any and all claims, demands, causes of action, disputes, controversies, and other matters in question arising out of or relating to this Agreement, any of its provisions, or the relationship between the parties created by this Agreement" was undoubtedly broad as it covers not only those issues arising out of the employment contract, but even those issues with any connection to the contract or to the relationship between the parties); *Mulqueen v. Radiology Assocs. of*

11

*Albuquerque, P.A.,* 2019 WL 1231408, at \*1 (N.M. Ct. App. Feb. 4, 2019) (confirming district court's order compelling arbitration where the employment agreement contained alternative dispute resolution language that included "any dispute arising from the employment relationship (including, but not limited to, claims arising under contract, common law, or Federal or State statutes and regulations)" and would first be subject to negotiation, then mediation, then arbitration).  Instead, the pre-suit mediation clause here is limited to "a claim, dispute or disagreement pertaining to provisions contained in this employment Agreement."  While the Court agrees that the language "pertaining to" is broad, it nonetheless marks a boundary by indicating some direct relationship to the Employment Agreement itself.  *See Atain,* 2025 WL 275940, \*3 (affirming that "pertains to" is a broad term that excludes all claims *with the subject matter of habitability*); *see also United States ex rel. Welch v. My Left Foot Children's Therapy*, LLC, 871 F.3d 791, 798-99 (9th Cir. 2017) (explaining that certain limiting terms such as "arising out of" or "related to" are not boundless and mark a boundary by indicating some direct relationship).  Here, Defendant does not cite nor can the Court find any provision contained in the Employment Agreement that pertains to the FCA, retaliation or statutory claims.  *See Miraca Life Sciences, Inc.,* 2021 WL 679275, \*2 (noting the Sixth Circuit's reliance in on the absence of reference to FCA, retaliation or statutory claims in an employment agreement as further support that an arbitration clause did not cover the FCA retaliation claim) (citing *U.S. ex rel. Paige v. BAES vs. Tech. Sols. & Servs., Inc.,* 566 F. App'x 500, 504 (6th Cir. 2014)).

Having determined that the pre-suit mediation clause is narrow, the Court also is not persuaded that Plaintiff's FCA retaliation claim falls within its purview.  On the contrary, the FCA claim does not relate to a dispute or disagreement pertaining to provisions contained in the Employment Agreement or the working terms and conditions of the employee/employer

12

relationship, but instead relates to whether Defendant was engaged in fraudulent billing in violation of the FCA in the first instance and retaliated in turn. *See Welch,* 871 F.3d at 799 (finding that FCA claims arose out of or were related to defendant's alleged act of fraudulent billing rather than plaintiff's employment). Moreover, the case law Defendant cites bears out this distinction where not only were the mediation/arbitration clauses broader than the pre-suit mediation clause at issue here, but the underlying issues directly impacted the terms and/or conditions of employment. For instance in *Lewis,* 2023 WL 2522812, *1, the underlying issue was defendant's alleged failure to pay plaintiff the required minimum wage and overtime in her job as a remote dental billing specialist; in *Jones*, 2025 WL 2671561, at *3, the underlying issues were whether defendant complied with requirements related to plaintiff's compensation structure and settlement deductions as a contracted truck driver for defendant; and in *LifeVantage Corp.*, 2021 WL 2779280, at *1-2, the underlying issues related to alleged breaches of contractual agreements and improper use of confidential and trade secret information following a business separation. None of this is the case here.

As such, the Court finds that Plaintiff's FCA retaliation claim is not a claim, dispute or disagreement the parties agreed to mediate and that the Employment Agreement is not implicated in Plaintiff's filing of an FCA retaliation claim. *See Miraca Life Sciences, Inc.,* 2021 WL 679275, *2 (denying motion to stay and to compel arbitration and concluding that plaintiff's FCA retaliation claim did not arise out of or in connection with the parties' employment agreement) (citing *Paige,* 566 F. App'x 500 (holding that arbitration clause failed to cover FCA retaliation claim because such a claim had nothing to do with the employment agreement itself))); *see also Welch*, 871 F.3d at 798-99 (affirming district court holding that relator's FCA claims did not fall within scope of arbitration agreement between relator and employer and that

13

FCA claim had no direct connection to relator's employment given that she could have brought same claims on behalf of government even if she had not been employed); *see also generally Garcia v. New Mexico Human Services Department*, 584 P.3d 812, 816-21 (N.M. 2025) (reversing the New Mexico Court of Appeals and holding that any collective bargaining agreement requirement to arbitrate or otherwise waive an employee's right to file a lawsuit involving an individual statutory right must be clear and unmistakable and that the collective bargaining agreement did not waive plaintiff's right to file separate whistleblower claim).

For the foregoing reasons, the Court denies Defendant's Motion to Dismiss on the ground that Plaintiff failed to comply with the mandatory pre-suit mediation requirement of the Employment Agreement.

### B.     FCA Retaliation Claim

"The False Claims Act imposes liability on any person who knowingly makes a false claim for payment to the federal government." *Potts v. Ctr. for Excellence in Higher Educ., Inc.*, 908 F.3d 610, 613 (10th Cir. 2018) (citing 31 U.S.C. § 3729(a)). It subjects to liability:

[A]ny person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

(C) conspires to commit a violation of [these and other subparagraphs.]

31 U.S.C. § 3729(a)(1)(A)–(C). "Because 'employees will often be in the best position to report frauds perpetrated by their employers,' the [False Claims Act] includes a whistleblower provision to protect employees from retaliation." *Potts*, 908 F.3d at 613 (quoting *McBride v. Peak Wellness*

14

*Ctr., Inc.*, 688 F.3d 698, 703 (10th Cir. 2012)).  This antiretaliation provision provides, in relevant

part, that:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

To state a claim for FCA retaliation, a plaintiff must plead facts "that prove (1) she

engaged in protected activity, (2) the defendant 'had been put on notice' of that protected activity,

and (3) the defendant retaliated against the plaintiff 'because of' that activity."  *United States ex

rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 764 (10th Cir. 2019) (quoting *McBride v. Peak

Wellness Ctr., Inc.*, 688 F.3d 698, 704 (10th Cir. 2012)).  "Protected activity" includes (1) acts

taken in furtherance of a substantive False Claims Act lawsuit and (2) other "efforts to stop 1 or

more [False Claims Act] violations."  *See* 31 U.S.C. § 3730(h)(1); *see also United States ex rel.

Grant v. United Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018) (defining the categories of

conduct that the False Claims Act's antiretaliation provision protects), *cited with approval in

Reed*, 923 F.3d at 765.  To establish notice, a plaintiff's "actions must have conveyed to [the

defendant] that he was attempting to stop [the defendant] from (1) engaging in fraudulent activity

to avoid paying the government an obligation or (2) claiming unlawful payments from the

government." *United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 79 F.4th 1262, 1271

(10th Cir. 2023) (citing 31 U.S.C. § 3730(h)(1)).  The defendant "does not need to know the

activity violates the FCA specifically" and the plaintiff "does not need to have furthered a qui

tam action." *Id.*  "Causation can be shown by a 'very close temporal proximity' between a

protected activity and an adverse employment action." *Dunn v. Shinseki*, 71 F. Supp. 3d 1188, 1192 (D. Colo. 2014) (quoting *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)).  The Tenth Circuit has "held that a one and one-half month period between a protected activity and adverse action may, by itself, establish causation, but a three-month period, standing alone, is insufficient to establish causation." *Miller v. Inst. for Def. Analyses*, 795 F. App'x 590, 596 (10th Cir. 2019).  Where temporal proximity alone is insufficient, a plaintiff must offer additional allegations to establish causation.  *Dunn*, 237 F. Supp. 3d at 1192.  One way to do so is by demonstrating a pattern of retaliatory conduct.  *Meiners v. Univ. of Kansas,* 359 F.3d 1222, 1231 (10th Cir. 2004).

Here, Plaintiff's theory is that she engaged in the latter category of protected conduct— efforts to stop FCA violations.  In Count II of her Complaint, Plaintiff alleges that she was unlawfully terminated in retaliation for voicing her concerns to Defendant regarding her good faith belief Defendant's use of her signature on H&Ps for patients she did not see in order to support reimbursement claims from Medicare/Medicaid was fraudulent and her good faith belief that Defendant's unbundling of surgical procedures she ordered constituted Medicare/Medicaid fraud.  Doc. 1 at 7, ¶ 32.

In *Grant*, the Fourth Circuit summarized the acts falling into this category as follows:

> Under this standard, an act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the [False Claims Act].  A belief is objectively reasonable when the plaintiff alleges facts sufficient to show that [s]he believed h[er] employer was violating the [False Claims Act], that h[er] belief was reasonable, that [s]he took action based on that belief, and that h[er] actions were designed to stop one or more violations of the [False Claims Act].  However, while the plaintiff's actions need not "lead to a viable [False Claims Act] action" as required under the [standard governing the first category of protected conduct], they must still have a nexus to a[ ] [False Claims Act] violation.

912 F.3d at 201–02 (footnote omitted).  The Tenth Circuit has adopted at least some parts of this standard, including, significantly, the requirement that the plaintiff's activities must have a nexus to a FCA violation.  *See United States ex rel. Sorenson v. Wadsworth Bros. Constr. Co., Inc.*, 48 F.4th 1146, 1160 (10th Cir. 2022) (determining that summary judgment was appropriately granted in the defendant's favor where the plaintiff failed to relate his various statements that he was not receiving federally required wages to potential violations of the False Claims Act).

Defendant argues that Plaintiff fails to plead facts sufficient to meet each element of an FCA retaliation claim.  Doc. 49 at 10-11.  Defendant argues that "voicing concerns" about Plaintiff's "good faith beliefs" to unnamed individuals regarding the improper use of her signature and unbundling surgical procedures fail to allege actions to support the required nexus to the FCA or to establish that Defendant was on notice that Plaintiff was attempting to stop FCA violations.  *Id.*  As for Plaintiff's signature, Defendant argues that Plaintiff's Complaint fails to identify dates of or provide records to support its use; fails to explain the mechanism by which her electronic signature was improperly applied; and fails to address how any such H&Ps impacted any government payor's reimbursement or that Plaintiff conveyed any of this information Defendant.  *Id.*  Defendant argues that without such alleged facts, Plaintiff's generalized complaint to an unidentified employee does not plausibly allege protected activity or notice to Defendant.  *Id.*  As to the unbundling of surgical procedures, Defendant argues that Plaintiff's complaint was not objectively reasonable.  *Id.*  Defendant explains that:

> Entirely absent from the Complaint are any facts explaining why – notwithstanding a physician's independent medical judgment – a physician's decision to decline to "operate on all areas of the patient" ordered by a nurse practitioner during a single visit was improper, let alone fraudulent.  Plaintiff alleges no facts that support an inference that a physician chose not to operate so that a patient would have to return for more procedures.  The Complaint also fails to allege any statute, regulation or rule that determines the sequencing or medical necessity of any procedure at issue.

17

*Id.* at 11.  Defendant argues that "[w]ithout such allegations, Plaintiff's belief that any "unbundling" reflected fraud (rather than clinical judgment) is not objectively reasonable.  *Id.*

Defendant goes on to argue that even if the Complaint sufficiently pleads that Plaintiff engaged in protected activity, Plaintiff's FCA retaliation claim still fails as a matter of law because the Complaint fails to include facts showing that Defendant took adverse action against Plaintiff because of her purported protected activity and instead Plaintiff merely alleges in conclusory fashion that Defendant terminated Plaintiff in retaliation for protected activity.  *Id.* at 11-13.  Defendant argues that relying on Tenth Circuit precedent, the gap of time from which Plaintiff allegedly engaged in protected activity to the date of her termination is well outside the temporal proximity necessary to establish causation.  *Id.*

In Response, Plaintiff contends that she has pled a plausible claim for retaliation.  Doc. 53 at 4-7.  That said, Plaintiff concedes that her allegations about the unbundling of procedures do not constitute protected activity for purposes of the FCA.  Doc. 53 at 4, n. 2.  Plaintiff contends, however, that she did engage in protected activity when she reported to the hospital's compliance officer that she believed the hospital was committing Medicare/Medicaid fraud by using her electronic signature on H&Ps for patients she had never seen.  Doc. 53 at 4.  Plaintiff contends she also reported her concerns to Dr. Butz and to the hospital's CEO Jim Heckert.  *Id.* Plaintiff further contends that she has pleaded sufficient facts to support a reasonable inference of causation.  *Id.* at 5.  Plaintiff contends that while the protected activity occurred eleven months prior to her termination of employment, during those months there was escalating antagonism between her and the hospital's management that included her complaint about the unbundling of surgical procedures and the false insinuation by Dr. Esparsen that Plaintiff improperly prescribed opioids to a patient in June 2020, which Plaintiff successfully rebutted.  *Id.* at 5-6 (citing *Adcox v.*

*Brennan*, 2017 WL 2405326 (D. Kan. June 2, 2017)). Plaintiff contends that a reasonable inference can be drawn from her allegations that Defendant was tired of dealing with Plaintiff making waves about fraudulent activity and patient safety, as well as her audacity to defend herself, and decided to terminate her in retaliation. *Id.* In sum, Plaintiff contends that she has pleaded facts sufficient to infer causation between her protected activity and the termination of her employment. *Id.*

In Reply, Defendant argues that even assuming Plaintiff did tell the compliance officer about alleged falsification of the H&Ps and stated it was "Medicare/Medicaid fraud," the Complaint fails to describe what facts she disclosed that would have put the compliance officer on notice that she was attempting to stop one or more violations of the FCA. Doc. 54 at 3-5. Defendant argues that Plaintiff's alleged report to Dr. Butz is even more deficient because Plaintiff does not plead that she asserted fraud when doing so. *Id.* Defendant further argues that Plaintiff did not plead that she reported her concerns about falsification of H&Ps and/or fraud directly to CEO Jim Heckert. *Id.* Instead, Plaintiff's Complaint alleges that it was only after raising the issue with Dr. Butz that CEO Heckert subsequently met with her to discuss the matter. *Id.* Defendant argues this distinction is significant as it undermines Plaintiff's attempt to establish that she engaged in protected activity, or put Defendant on notice of the same, by reporting suspected fraudulent H&Ps to a decision-maker involved in her termination. *Id.*

Defendant further argues that Plaintiff fails to plausibly plead causation based on timing and an alleged pattern of antagonism. Doc. 54 at 5-6. Defendant argues that Plaintiff has not pleaded any link between the two events she cites and her purported protected activity that form an alleged pattern of antagonism. *Id.* Defendant argues that the temporal gap of eleven months between Plaintiff's purported protected activity and the termination of her employment

19

undermines any inference of causation and that Plaintiff's reliance on generalized allegations of antagonism is insufficient to plausibly suggest that her termination was the result of unlawful retaliation. *Id.* Defendant also argues that Plaintiff's reliance on *Adcox* is misplaced because the conduct that formed the pattern of antagonism in that case, and in turn supported causation, occurred less than six weeks after the plaintiff's first formal complaint and involved nearly sixty separate incidents of alleged harassment by the individual who was the subject of Adcox's EEO complaint, conduct which is not present here. *Id.* In sum, Defendant argues that Plaintiff has failed to adequately plead causation and her claim should be dismissed on that basis.

The Court finds that Plaintiff's Complaint contains allegations sufficient to demonstrate protected activity and notice in September 2019. Plaintiff's Complaint alleges that on September 13, 2019, she discovered that her electronic signature was being used by unlicensed healthcare providers in the pain management clinic for H&Ps on patients she had not seen. Plaintiff's Complaint further alleges she believed this was being done to support claims submitted for reimbursement to government payors. Plaintiff's Complaint alleges that she immediately alerted Defendant's Compliance Office about the improper use of her electronic signature and explicitly stated her concern that this practice constituted "Medicare/Medicaid fraud." Plaintiff additionally notified the Medical Director of the Chronic Pain Clinic, who in turn set up a meeting with, among others, CEO Heckert and Defendant's Chief Compliance Officer. Plaintiff's Complaint alleges that CEO Heckert subsequently met with Plaintiff and assured her "that Defendant would investigate and remedy the matter." Doc. 1 at 3. Although Defendant did not directly follow-up with Plaintiff, Plaintiff's Complaint nonetheless alleges that the matter was investigated and addressed. Based on the foregoing, the Court concludes that Plaintiff's allegations demonstrate her reported concerns were motivated by an objectively

reasonable belief regarding an occurring or potential FCA violation, *i.e.,* protected activity, and that her actions conveyed to Defendant she was attempting to stop Defendant from claiming unlawful payments from the government, *i.e.,* notice.

The Court finds, however that Plaintiff's Complaint fails to sufficiently allege causation which is fatal to her FCA retaliation claim. Plaintiff concedes that eleven months passed from her protected activity to the termination of her employment – a period of time insufficient on its own to establish causation. *Miller*, 795 F. App'x at 596. Plaintiff nonetheless attempts to persuade the Court that, based on two subsequent events, she has pleaded sufficient facts demonstrating a pattern of escalating antagonism from Defendant towards her during those eleven months to support an inference of causation between Plaintiff's protected activity and termination. The Court is not persuaded.

As to the first event, Plaintiff's Complaint alleges that on March 16, 2020, she emailed Ms. Bynum about four cases of purported unbundling of procedures. Plaintiff's Complaint further alleges that Ms. Bynum responded the following day and told Plaintiff the cases would be referred to "Quality for review." As to the second event, Plaintiff's Complaint alleges that on June 18, 2020, or three months later, Dr. Esparsen emailed Plaintiff and told her she had to respond to Risk Management concerning a report from CVS Pharmacy he had received and deemed problematic. Plaintiff's Complaint further alleges that it was only after push back by Plaintiff that Dr. Esparsen admitted he had "misspoken" about it being problematic and she did not have to respond to Risk Management. Plaintiff asks the Court to infer from these two events that she had embarrassed Dr. Esparsen and that he, along with CEO Heckert, had grown tired of dealing with Plaintiff "making waves about fraudulent activity and patient safety at the hospital"

21

and that "Plaintiff having the audacity to defend herself against Dr. Esparsen's sham allegations . . . was the last straw."  Doc. 53 at 6.

To begin, Plaintiff's Complaint alleges Defendant responded to Plaintiff's reported concerns about the improper use of her electronic signature by holding a meeting with high-level hospital administrators, including Defendant's CEO; conducting an investigation; preparing a report; and providing assurances that the matter would be remedied.  Indeed, despite not receiving direct follow-up from CEO Heckert, Plaintiff's Complaint makes no allegations that her electronic signature continued to be used improperly after she raised her concerns in September 2019.  Plaintiff's Complaint, therefore, fails to allege facts that her protected activity in the first instance was met with antagonism and instead supports that Plaintiff's concerns were taken seriously and adequately addressed.  Additionally, Plaintiff's Complaint fails to allege facts to support that Plaintiff sending an email to Ms. Bynum on March 16, 2020, to which Ms. Bynum responded is evidence of a pattern of antagonism and/or retaliation towards Plaintiff. On the contrary, Plaintiff's Complaint alleges that Ms. Bynum responded the very next day and indicated she was referring the cases to "Quality for review."  As for Dr. Esparsen's inquiry regarding Plaintiff's prescribing of opioids in June 2020, Plaintiff's Complaint alleges that it was prompted not internally but by an external CVS Pharmacy notification.  And although Dr. Esparsen initially represented it was problematic and required a response from Plaintiff to Risk Management, he subsequently admitted he had misspoken.  While Plaintiff's Complaint alleges she had to persist in her position that the CVS notification was a "common form" that did not require a response to Risk Management, Plaintiff's Complaint nonetheless fails to allege facts to support that Dr. Esparsen's initial directive to Plaintiff in response to an external inquiry

regarding Plaintiff's prescribing of opioids was motivated by antagonism towards Plaintiff in response to protected activity nine months earlier.

In sum, the Court is not persuaded that Plaintiff's allegations related to (1) her March 16, 2020, email to Ms. Bynum, and (2) to Dr. Esparsen's June 18, 2020, inquiry prompted by the CVS Pharmacy notification, demonstrate a pattern of antagonism or retaliatory conduct in response to Plaintiff's protected activity in September 2019. *See, e.g., Lester v. Shadow Mountain Mgmt. Corp.,* 2025 WL 1744856, at *3 (D. Colo. June 24, 2025) (finding causation in the absence of temporal proximity where in the months following whistleblowing defendant demanded, *inter alia,* a list of all complaints or reports made against it for the purpose of learning the identities of whistleblowers and to remove dissenting voices); *Dunn*, 71 F. Supp. 3d at 1193 (finding a pattern of retaliatory conduct where defendant subjected plaintiff to increasingly punitive adverse employment actions over several months in response to plaintiff's active participation in discrimination lawsuit); *Adcox*, 2017 WL 2405326, *8 (denying summary judgment on plaintiff's retaliatory harassment claim where the evidence supported a pattern of increased antagonism that immediately followed plaintiff's EEO complaint and continued for several months in the form of "consistent and repeated job discussions" with plaintiff over a "host of issues" such as work performance and assignments, disputes over leave-related issues, and increased route observation). Because Plaintiff's Complaint fails to allege facts sufficient to demonstrate temporal proximity or to offer evidence from which to infer a retaliatory motive, Plaintiff's FCA retaliation claim necessarily fails for lack of causation. *Miller*, 795 F. App'x at 596 (holding that in the absence of temporal proximity and no evidence from which to infer a retaliatory motive, plaintiff's FCA retaliation failed for lack of causation).

C.        **State Law Wrongful Discharge**

The Court had jurisdiction over Plaintiff's FCA retaliation claim under 31 U.S.C. § 3732(a), which permits any action under § 3730 to be brought in federal court.  The Court also had jurisdiction under 28 U.S.C. § 1331, federal question. *See* Doc. 1 at 3.  Under 28 U.S.C. § 1367(a), "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  But a court may decline supplemental jurisdiction if an exception under 28 U.S.C. § 1367(c) applies.  *See Gudenkauf v. Stauffer Commc'ns, Inc.*, 896 F. Supp. 1082, 1084 (D. Kan. 1995).  One of those exceptions is when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).  In deciding whether to exercise supplemental jurisdiction, a court also considers judicial economy, convenience, and fairness. *Wittner v. Banner Health*, 720 F.3d 770, 781 (10th Cir. 2013).

Having dismissed Plaintiff's FCA retaliation claim, only Plaintiff's state-law wrongful discharge claim remains.  Based on the considerations outlined above, the Court declines to exercise supplemental jurisdiction over that claim and dismisses it without prejudice.[8]

### IV.  CONCLUSION

For the foregoing reasons, the Court finds that Defendant's Motion to Dismiss is well taken in part and **GRANTED IN PART**.

**IT IS THEREFORE ORDERED** that Count II of Plaintiff's Complaint is **DISMISSED WITH PREJUDICE** for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6); and

---

[8] In her Response, Plaintiff requests the Court decline supplemental jurisdiction and "let a New Mexico State Court sort out whether Plaintiff can proceed with the claim."  Doc. 53 at 6.

**IT IS FURTHER ORDERED** that the Court declines to exercise supplemental jurisdiction over Count III of Plaintiff's Complaint and it is **DISMISSED WITHOUT PREJUDICE**.

_____
**JOHN F. ROBBENHAAR**
**United States Magistrate Judge**
**Presiding by Consent**

25